In the matter of ALFRED B. COSEY, a solicitor, &c.

[Decided April 29th, 1915.]

1. Evidence *held* to show that a solicitor was guilty of extortion from, and of misappropriation of money of, his clients, justifying disbarment.

2. A settlement of a controversy between an attorney and his client, by the attorney paying back to the client money received, and surrendering notes executed by the client to the attorney, is evidence of extortion by the attorney from the client.

On motion to strike from the roll.

*Mr. Nelson B. Gaskill,* for the motion.

*Mr. Thomas S. Henry, contra.*

HOWELL, V. C.

A complaint was laid before the chancellor against Alfred B. Cosey, one of the solicitors of this court, that in the management of the business of his clients he had been guilty of malpractice. Upon filing the affidavits constituting the complaint the chancellor made an order requiring him to appear before one of

the vice-chancellors, on a day named, then and there to show cause why he should not be adjudged guilty of malpractice and thereupon be debarred from further practicing as a solicitor of this court, or be suspended from so practicing for such time as the chancellor should order, or be otherwise disciplined and punished for his misconduct, as might be deemed equitable and just.

The hearing was fixed for June 23d, 1914, but was continued until November 2d of the same year, for the reason that the complaining witnesses were out of the country. It may properly be said at this point that in taking the testimony the greatest possible liberality was extended toward the solicitor. All important questions as to the admissibility of evidence which were doubtful, or which were discretionary in the judge, were decided in his favor. He appeared in person, was confronted by the opposing witnesses, and had the benefit of advice of competent counsel and his assistance during the trial. The case was heard upon the theory that the question being tried was a question of personal privilege and not a question of either civil or criminal liability.

There were eight specifications in the complaint and order to show cause alleged against him. These will be taken up in their order. They charge extortion from his clients and the misappropriation of their money.

The first charge relates to a foreclosure proceeding carried on in this court under the title of *Schoonmaker* v. *Richardson.* The property in question is known as the City Market of Plainfield. Cosey agreed with Mrs. Conod, who was acting for a Mrs. Schoonmaker, her sister, and holder of the mortgage, that he would foreclose the mortgage for a fee of $75 and costs, which were estimated at $225. This would make a payment of $300 in all. Payments were made, as the foreclosure suit proceeded, as follows:

| | |
|---|---|
| September 10th, 1913 | $70 00 |
| September 24th, 1913 | 60 00 |
| October 9th, 1913 | 34 00 |
| November 10th, 1913 | 78 00 |
| Total | $242 00 |
| Counsel fee added | 75 00 |
| Total | $317 00 |

It will be observed by these items that there was an overpayment to Cosey of $17. The foreclosure suit proceeded, and at the end the costs were taxed at $145.93. This money (the costs) was collected by Cosey, with the principal and interest of the mortgage on February 25th, 1914, and was not paid over to Mrs. Schoonmaker until April 1st following. The taxation of costs included a special allowance under the rules of $51. While it is quite usual for solicitors of this court in making settlements for their clients to estimate the amount of taxable costs incurred in the proceeding, yet it can be hardly said that when a solicitor is dealing with his client he ought to have the same freedom in dealing with the estimated costs as he would have were he dealing with an opposing solicitor. It appears by the evidence that the estimate made for that proceeding was arrived at by referring to a sheriff's deed in a prior foreclosure of a mortgage upon the same property. This, however, does not palliate the offence with which Cosey stands charged. He received $242; the costs were taxed at $145.93, and if he had dealt openly and fairly with his client, the latter amount is the amount that she would have paid. As it is, he appears to have overcharged her in the item of costs alone, $96.07. I think it is fair to call this a case of extortion, for the reason that it is a dealing between a solicitor and a client. If the solicitor and the payer were dealing adversely, and at arms'-length, the situation would be entirely different, but the relation of attorney and client is one of the very utmost good faith and confidence, and any, the slightest, advantage taken by a solicitor of the lack of knowledge on the part of his client is reprehended as a serious breach of the ethics of the profession. In addition to the facts above set out in relation to this charge, it appears in the testimony that Cosey at the time of the settlement with his client endeavored to have her pay him a further sum of $25, as counsel fee, making a hundred dollars in all. While perhaps it cannot be said that anything beyond mere suggestion was made in relation to it, still suggestions of that sort may in some cases be very improper. At any rate, it points to the willingness of the solicitor in this case to obtain from his client more money than he had agreed upon with her.

The next allegation against Cosey relates to property known as the Cottage street property, in litigation in what was known as the Thomsen suit. This was a suit brought by the accused solicitor in favor of Mrs. Conod against the Plainfield National Bank for the purpose of establishing a $3,000 mortgage held by her as a lien prior to an $8,000 mortgage held by Thomsen and pledged with the bank as collateral security for a loan. He agreed to carry the suit through for $200, and Mrs. Conod paid him that amount. She was compelled to pay the costs of the bank, which were taxed at $12.08. She paid Cosey on this account as follows:

| | | |
|---|---:|---:|
| February 26th, 1913 | $60 | 80 |
| March 27th, 1913 | 45 | 00 |
| May 5th, 1913 | 15 | 00 |
| May 16, 1913 | 20 | 00 |
| August 6th, 1913 | 78 | 84 |
| August 15th, 1913 | 18 | 00 |
| August 27th, 1913, note | 75 | 00 |
| Total | $312 | 64 |

There was no explanation by Cosey of this overpayment, and I am bound to consider it extortionate, to the extent that it exceeds $200. Two of the checks, marked *Exhibit P 6* and *P 7*, aggregating $96.84, were obtained from Mrs. Conod upon the statement that it was necessary to pay this money to the court of chancery before her case could proceed. Two things will strike a lawyer about this statement, one, that the court of chancery as such did not demand or receive any money from Cosey; and the other is that $96.84 would be an unusually large amount for costs in an unfinished proceeding. There is one other significant circumstance in relation to this case, and that is, it disclosed the fact that the complainants' costs were never taxed, so that it was impossible for Cosey to know that they amounted to $96.84.

The next allegation relates to the question of the liability of Mrs. Conod and her husband on the bond which accompanied the mortgage which was foreclosed in the case of *Schoonmaker* v. *Richardson*. Mr. and Mrs. Conod were stockholders in a corporation known as the La Rue Realty Company; that company made the bond in question. Mr. and Mrs. Conod were ad-

vised by Cosey that they were liable on that bond, and he induced them to enter into an agreement in relation thereto, which was offered in evidence in the case. There is a discrepancy in the evidence concerning this agreement. By its terms Cosey undertakes to relieve the La Rue Realty Company of its liability on the bond in question. Mr. and Mrs. Conod both say that the real agreement between them was that Cosey should relieve *them,* Mr. and Mrs. Conod, from their liability on the bond on payment to him of twenty-five per cent. of the amount of the bond, the bond being for $5,000. By a manipulation, which need not be recited here, he succeeded in getting the old third mortgage canceled and the bond destroyed and a new bond and mortgage made in place thereof, which the La Rue Realty Company did not execute, and then claiming to have relieved Mr. and Mrs. Conod from their liability on the bond, he extorted from them notes aggregating $300 on account of the grossly outrageous fee agreed on. These notes were dated on January 27th, 1914, and were for $50 and $100 and $150, respectively. I am satisfied from the evidence that the claim of liability on the part of Mr. and Mrs. Conod on a bond which they had not signed was stirred by Cosey merely for the purpose of making a basis for extorting money from his clients. While the agreement appears to have been made between Mr. and Mrs. Conod of the one part, and Cosey of the other part, it is, on its face, an agreement for relieving, or causing to be relieved, the La Rue Realty Company from responsibility on the bond in question. I am satisfied that it was meant to be an agreement to relieve Mr. and Mrs. Conod of their liability on the bond, and this view is strengthened by a letter written by Cosey to Mrs. Schoonmaker, in which he says:

"I brought the whole bond and mortgage from no value to its present value and could and would have made a better bargain but for the fact that the La Rue Realty Company was on both bonds, which really means Mr. and Mrs. Conod and all of their property, and I knew if they were sued on the bond it would wipe them out entirely. I am under a contract with Mr. and Mrs. Conod to relieve them of those bonds; you also instructed me to see to it that they were relieved from those bonds."

I am, therefore, convinced that statements made by Mr. and Mrs. Conod in relation to the conduct of Cosey in this matter

are true, and that by means of a statement which he cannot but have known was an incorrect statement of the law, he induced them to give him notes in the aggregate sum of $300, and also threatened them with suit for an amount equal to one-fourth of the bond ($1,250).

The next allegation relates to property known as No. 21 Lenox Place, Maplewood, the title to which stood in the name of Mrs. Conod. Cosey procured Mr. and Mrs. Conod to sign a deed, with the name of the grantee blank, in which blank the name of the Grove Realty Company was afterwards inserted by Cosey, but the deed was never acknowledged and never recorded. By means of the authority conferred upon him by the ownership of the property under this deed, he collected from Mr. Fuller, the tenant, $200 rent, being the rent at the rate of $50 a month for four months. This money, the Conods say, was never repaid to them. Cosey admits that it was never repaid to them, but says that it was appropriated by him to the payment of fees and expenses in their various law suits; but he was unable to specify to what fees and costs they were so credited. It likewise appears in the evidence that Cosey kept no account in his books of account with the Conods, and it is somewhat difficult to see how he could have appropriated the money which was so received by him to the uses to which he says it was put, in the absence of some account or memorandum to show how it was done. There is some evidence to show that he notified the Conods that he was going to appropriate the money to costs and expenses in their law suits, but this does not seem to have ever met with their approval.

The next allegation against him refers to property known as 98 and 100 Morris avenue, Newark, the title to which was in Mrs. Conod. Her taxes for 1913 were not paid. For reasons which are unimportant here, it was found necessary that the taxes should be paid at once, and for this purpose Mrs. Conod gave to the accused solicitor her check for $310, with the understanding that if the taxes did not amount to so much he should repay the surplus to her. He actually paid $274.40, leaving a balance of $35.60, which he never paid to her in any form, and for the retention of which he offers no excuse whatever.

The next allegation against him relates to property on Market street, in Newark, the title to which was in Mrs. Conod. It was subject to a mortgage held by one Headley, and was in the hands of Elroy Headley, a solicitor of this court, for foreclosure. After considerable negotiation, Headley agreed that if the Conods would give him a deed for the property, and thus save the expense and time of foreclosure, he would pay him $75. The deed was prepared and executed by them and delivered to Cosey, to be delivered to Headley. He made the delivery and collected the $75. This money was never paid over to Mrs. Conod, but was said by Cosey to have been appropriated by him to start a suit for $10,000 against the La Rue Realty Company, which suit was never brought.

The seventh allegation against him relates to another instance of the supposed liability of the Conods upon another bond which had been given by the La Rue Realty Company. He demanded $300 as compensation for getting the Conods relieved from liability on this bond. On January 27th, 1914, Mr. and Mrs. Conod gave to Cosey three promissory notes for $50, $100 and $150, respectively, payable ———— months after date. The blank was afterwards filled in while the notes were in Cosey's possession by the insertion of the word "two," in a different colored ink. These notes were renewals of the first set given by them to him. As far as I can see, Cosey, on this occasion, did nothing whatever in the direction of relieving the Conods of their supposed liability.

The last accusation is this: There were two foreclosure suits against property owned by Mrs. Conod which were known as the Benker and Davis foreclosures. Cosey represented to his clients that inasmuch as Mr. and Mrs. Conod were both made parties to the suit, they would have to answer, and that this made it necessary for him to prepare and file two answers in each suit, and for this he obtained the promissory notes of Mr. and Mrs. Conod for a sum aggregating $150. His first statement to them was that the answers would cost $25 apiece, making a total of $100, and when he came to get the notes signed, Mrs. Conod says that he fraudulently got her to sign two notes for $50 each instead of $25 each. This he denies, but it is a fact, and is so

admitted by him, that instead of filing four answers, he filed two, as he put it, joint answers of the husband and wife in the two suits.

In the spring of 1914 the Conods conceived that advantage had been taken of them by Cosey, and they broke with him and demanded that he should pay back some portion of the money and redeliver to them the notes which had been paid and given to him by them. As the result of the negotiation, Cosey agreed that he would pay back the sum of $300 in cash and would surrender notes aggregating $450, making $750 in all. While in an ordinary case, a settlement of a controversy would be commended by the court, in a case of this character such a settlement can only be evidence that Cosey had extorted from his clients money and notes aggregating $750 in value.

I consider that the charges against Cosey have been fully proved, and that the case is a proper one for the severest discipline. The duty of a solicitor, in the exercise of his profession, is very well stated in the case of *Fairfield* v. *Taylor, 60 Conn. 11.* There the chief-justice, after a statement of the facts in that particular case, says:

"It is hardly possible to characterize such conduct of an attorney-at-law in measured terms. That it was a gross violation of the attorney's oath is only a moderate statement. That it manifested a low condition of moral sensibility is true, and that it showed the appellant to be utterly wanting in the qualities which would entitle him to public confidence is also true. It is not enough for an attorney that he be honest. He must be that, and more. He must be believed to be honest. It is absolutely essential to the usefulness of an attorney that he be entitled to the confidence of the community wherein he practices. If he so conducts in his profession that he does not deserve that confidence, he is no longer an aid to the court nor a safe guide to his clients. A lawyer needs, indeed, to be learned. It would be well if he could be learned in all the learning of the schools. There is nothing to which the wit of man has been turned that may not become the subject of his inquiries. Then, of course, he must be specially skilled in the books and the rules of his own profession. And he must have prudence and tact to use his

learning, and foresight, and industry, and courage. But all these may exist in a moderate degree, and yet he may be a credit-able and useful member of the profession, so long as the practice is to him a clean and honest function. But, possessing all these great faculties, if once the practice becomes to him a mere 'brawl for hire,' or a system of legalized plunder where craft and not conscience is the rule, and where falsehood and not truth is the means by which to gain his ends, then he has forfeited all right to be an officer in any court of justice, or to be numbered among the members of an honorable profession."

Every word of the foregoing quotation applies to the case in hand.

An order will be made prohibiting Cosey from further prac-ticing as a solicitor or counsel in this court. The result reached is concurred in by all the members of the court, the case having been considered at a general conference.